Argued November 14, 1928, affirmed January 8, 1929.

## J. E. REEVES ET AL. *v.* OREGON EXPLORATION CO.

(273 Pac. 389.)

For appellant there was a brief over the name of *Messrs. Rice & Orcutt,* with oral arguments by *Mr. Maurice D. Leehey* and *Mr. Dexter Rice.*

For respondents there was a brief and oral argument by *Mr. A. E. Reames.*

RAND, J.—Plaintiffs are the owners of a tract of land in Douglas County, consisting of 120 acres,

which was entered and patented in 1909 to their immediate grantor under the act of June 3, 1878, which act is commonly known as the Timber and Stone Act. The defendant corporation is the owner of an unpatented quartz mining claim which was located on July 1, 1919, on public lands adjoining said patented land. As located the claim contains the apex of a vein which on its downward course extends laterally through one of its side-lines and penetrates into the patented land. The defendant corporation appeals from a decree enjoining it and the other defendants, who are its agents and officers, from trespassing on said patented land. The trespass complained of consisted of the stoping and removal by defendants of ore from the segment of the vein which underlies the surface of the patented land. There is no suggestion in the record that at the time the lands were entered or patented the vein was known to exist or that the lands contained any mineral deposit whatever, nor is it claimed that at that time the defendant corporation, or any grantor of the defendant corporation, was in privity with the United States as to said vein or any interest therein.

■ The sole question for decision is whether the owner of a valid lode claim may follow the dip of a vein which apexes within the boundaries of the claim into adjoining land, which, prior to the discovery and location of the vein, was patented under the Timber and Stone Act, and may remove the ore therefrom without the consent of the owner of such land, where at the time of the entry of the land the vein had not been discovered or located and it was not known to exist. We think that the question is so well settled as to be no longer open to discussion.

In *Loney* v. *Scott*, 57 Or. 378 (112 Pac. 172, 32 L. R. A. (N. S.) 466), Mr. Justice EAKIN, speaking for the court, said:

" * * The rule is, that a patent to government land transfers to the patentee all veins, lodes, or other minerals, within its boundaries, unless such mineral deposits were known to exist at the time of the issuance of the patent, in which latter case the known mineral deposits do not pass by the patent."

In *Deffeback* v. *Hawke*, 115 U. S. 392 (29 L. Ed. 483, 6 Sup. Ct. Rep. 95), it was held that no title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnabar or copper could be obtained under the pre-emption, homestead or town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands and that the exception of mineral lands from sale or grant by the United States applied only to mines which were known to exist at the time the lands were purchased and the applicant therefor became entitled to a patent. In respect thereto the court said:

" * * We also say lands known at the time of their sale to þe thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterwards, rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the government under the pre-emption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We, therefore, use the term known to be valuable at the time of sale, to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed

when the entry of them was made and the patent issued.''

In *Davis' Admr.* v. *Weibbold,* 139 U. S. 507, 519, (35 L. Ed. 238, 11 Sup. Ct. Rep. 628), the court said:

''The exceptions of mineral lands from preemption and settlement and from grants to States for universities and schools, for the construction of public buildings, and in aid of railroads and other works of internal improvements are not held to exclude all lands in which minerals may be found, but only those where the mineral is in sufficient quantity to add to their richness and to justify expenditure for its extraction, and known to be so at the date of the grant.''

And again on page 524:

''It would seem from this uniform construction of that department of the government specially entrusted with supervision of proceedings required for the alienation of the public lands, including those that embrace minerals, and also of the courts of the mining States, Federal and State, whose attention has been called to the subject, that the exception of mineral lands from grant in the acts of Congress should be considered to apply only to such lands as were at the time of the grant known to be so valuable for their minerals as to justify expenditure for their extraction.''

The defendant corporation, however, contends that the rule that all but known mineral deposits vest in the patentee upon the issuance of the patent has no application to a segment of a vein which apexes on adjacent land, even though the vein was not discovered or located until after the issuance of the patent. It also contends that the defendant has the same right to follow the vein into the patented land it would have if the question was one between two lode claimants owning adjoining patented lode claims.

■ In support of the first proposition the argument is that Section 2 of the act of July 26, 1866 (14 Stat. 251), provides that a lode claimant, upon compliance with the act, may file in the local land office a diagram of his lode or vein "and receive a patent therefor, granting such mine, together with the right to follow such vein or lode with its dips, angles and variations, to any depth, although it may enter the land adjoining, which land adjoining shall be sold subject to this condition." The defendant admits that these provisions were repealed by the act of May 10, 1872 (17 Stat. 91), but contends that they were re-enacted by the repealing act and were preserved and protected by the provisions of Section 1 of the Timber and Stone Act, which provides: "That none of the rights conferred by the act approved July twenty-sixth, eighteen hundred and sixty-six, entitled * * shall be abrogated by this act." The act of May 10, 1872, repealed all of Section 2 of the act of July 26, 1866, which included the phrase "which land adjoining shall be sold subject to this condition." That particular provision was not re-enacted by either of the two later acts referred to, and since it or any similar provision was not contained in either of the later acts, it was repealed and not in force at the time the Timber and Stone Act was passed and, therefore, could not have been within the contemplation of Congress at that time. In repealing the provision referred to, "which land adjoining shall be sold subject to this condition," Congress said: "but such repeal shall not affect existing rights." The meaning of this language is plain. Only rights then existing were those which were not to be affected by its repeal. If at that time no subsisting right had been acquired under the act,

it was not within the saving clause of the repealing act. There is no basis upon which the assumption of defendant that a supposed right claimed to have been acquired under the repealed provision more than fifty years after its repeal can be sustained. Defendant's rights are to be measured by the laws in force at the time its location was made and at that time the clause referred to was not in force.

■ We find no merit in the contention that defendant has the same right to follow its vein under the surface of plaintiffs' land that it would have had if plaintiffs' land had been acquired under the mining laws. The right of a junior lode claimant, whether his claim be patented or unpatented, to follow the dip of his vein into an adjoining patented or unpatented lode claim is one which arises under the mining laws and is confined to titles acquired under the mining laws, and has no application to a case where the vein of a lode claim on its dip extends into lands the title to which has been acquired under agricultural patents. Between lode claimants the right of one to pursue his vein on its dip under the surface of the other is recognized by the courts: See 2 Lindley on Mines (3 ed.), § 611, and authorities cited. But such right is not recognized by the courts as between a lode claimant and an agricultural claimant whose title was acquired under a grant made prior to the location of the lode claim. We think that this particular question is settled by the decision of Judge SAWYER in *Amador-Medean Gold Min. Co.* v. *South Spring Hill Gold Min. Co.*, 13 Sawy. 523 (36 Fed. 669). The doctrine announced in that case has been recognized as the law for more than fifty years and we have been cited to no case holding to a contrary doctrine.

■ The patent in this case was issued under the Timber and Stone Act. Prior to its issuance the United States was the absolute owner of the land and of all minerals contained in it, and when it parted with its title to the land it conveyed all minerals not known to exist at the time of the grant. In this respect there is no difference between a patent issued under the Timber and Stone Act and one issued under either the homestead, pre-emption, desert land or town-site laws. In each instance the title conveyed is a fee-simple title, and if the land contained minerals which were known to exist at the time the patent was issued, the title conveyed by the patent is conclusive upon all third parties whose rights did not attach before the patent was issued. In such case only the government or a party whose rights had attached prior to the issuance of the patent can question the title conveyed by the patent. As said by Mr. Chief Justice MARSHALL in *Hoofnagle* v. *Anderson*, 7 Wheat. 212, 214, 215 (5 L. Ed. 437):

"It is not doubted that a patent appropriates land. Any defects in the preliminary steps, which are required by law, are cured by the patent. It is a title from its date, and has always been held conclusive against all those whose rights did not commence previous to its emanation. * * If the patent has been issued irregularly, the Government may provide means for repealing it; but no individual has a right to annul it, to consider the land as still vacant, and to appropriate it to himself."

Of the same import, said the court in *Burke* v. *Southern Pac. R. R. Co.*, 234 U. S. 669, 693 (58 L. Ed. 1527, 34 Sup. Ct. Rep. 907), are *Cooper* v. *Roberts*, 18 How. 173, 182 (15 L. Ed. 338), *Spencer* v. *Lapsley*, 20 How. 264, 273 (15 L. Ed. 902), and

*Ehrhardt* v. *Hogaboom,* 115 U. S. 67, 68 (29 L. Ed. 346, 5 Sup. Ct. Rep. 1157). In the Burke case, *supra,* Mr. Justice VAN DEVANTER, on page 692, said:

"Of course, if the land officers are induced by false proofs. to issue a patent for mineral lands under a non-mineral-land law, or if they issue such a patent fraudulently or through a mere inadvertence, a bill in equity, on the part of the Government, will lie to annul the patent and regain the title, or a mineral claimant who then had acquired such rights in the land as to entitle him to protection may maintain a bill to have the patentee declared a trustee for him; but such a patent. is merely voidable, not void, and cannot be successfully attacked by strangers who had no interest in the land at the time the patent was issued and were not prejudiced by it."

■ Where Congress has provided for the disposition of various classes of public lands and has authorized the officers of the Land Department to ascertain the character of such lands and issue patents therefor in the absence of fraud, imposition or mistake, the determination of that department as to the character of the land is conclusive; and where a determination has been made and a patent issued, it is conclusive that the lands in question are nonmineral in character, and no right can thereafter be originated by any subsequent discovery or location of a mineral vein within the limits of the land patented: See *St. Louis Smelting etc. Co.* v. *Kemp,* 104 U. S. 636, 641 (26 L. Ed. 875); *Steel* v. *St. Louis Smelting etc. Co.,* 106 U. S. 447 (27 L. Ed. 226, 1 Sup. Ct. Rep. 389); *Heath* v. *Wallace,* 138 U. S. 573, 585 (34 L. Ed. 1063, 11 Sup. Ct. Rep. 380); *Barden* v. *Northern Pac. R. R. Co.,* 154 U. S. 324 (38 L. Ed. 992, 14 Sup. Ct. Rep. 1030); *Burke* v. *Southern Pac. R. R. Co., supra.*

Mr. Lindley, in treating of lands acquired under the Timber and Stone Act, in 1 Lindley on Mines, Section 210, says:

" * * The judgment of the department, culminating in the issuance of the final receipt or certificate, is final and conclusive as to the character of the land, and no subsequent discovery of mineral can affect the title of the purchaser. This is a universal rule governing all classes of entries on the public domain."

The location of a valid lode claim has some of the effects of a grant. So long as the locators comply with the law, the location carries with it

"the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface-lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of said surface locations: Provided, That their right of possession to such outside parts of said veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as aforesaid, through the end-lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of said veins or ledges; * * ."

Where lands have been patented before the making of a lode location, Mr. Lindley says:

"To say that the right to pursue a vein on its downward course, outside of and beyond vertical planes drawn through the lateral boundaries, is interrupted when a plane drawn through the surface boundaries of a prior grant is encountered, which grant did not in terms or inferentially reserve the privilege of underground invasion, is but the state-

ment of a self-evident proposition. In such a case the segment of the vein underlying the surface of the prior grant has been conveyed, the title to it has passed out of the government, and the government cannot grant the same thing twice." 2 Lindley on Mines, (3 ed.), § 611.

Prior to the time when the lands in question were entered and patented the United States was the absolute owner of them and they were subject to disposal under the Timber and Stone Act. At that time the mining location under which the assumed rights of the defendant corporation are based had not been made and the vein in question, so far as the record in this case discloses, had not been discovered or located by anyone. Defendant, therefore, could have had no right or interest in the lands whatsoever and were not in privity with the United States at that time. Not having been in privity with the United States at that time, they are not in a position to now question the title conveyed by the patent or the extent of the title as to said lands or any mineral deposit contained therein. The patent conveyed a fee-simple title to the lands, and since the government of the United States was the absolute owner of the lands before the conveyance, the entryman became the absolute owner of them upon the issuance of the patent and acquired all the rights which the government had theretofore possessed in them, subject only to the right of the government to have the patent annulled because of fraud, imposition or mistake. The United States has never questioned plaintiffs' title, and the time in which it could do so had passed before the vein in question was discovered or located, and hence, under the authorities which we have cited, even if the vein had been known to exist and to penetrate the land at the time the patent was issued,

neither defendant nor the government of the United States could have questioned plaintiffs' title to the segment of the vein underlying the land at the time the location in question was made, for, at that time, the government had granted to the entryman, and the grant had become irrevocable, the land which included not only its surface but everything that lay underneath it.

Since the title conveyed by the patent was a fee-simple title, it conveyed the land itself and everything underlying the surface of the land, whether mineral or otherwise. Since at the time defendant's claim was located the title to the segment of defendant's vein which underlies the surface of the patented land had passed from the government to the entryman and from the entryman to plaintiffs, the title to such segment was not subject to any further grant or conveyance by the government to any person who might subsequently locate a vein on adjoining land. Upon reaching a plane drawn vertically through one of the boundaries of the patented land, a subsequent locator of the claim had no right to pursue the vein into the patented land. The right of such a locator terminated upon reaching that plane and he could not pass beyond it into the patented land.

Regardless of whatever rights may be acquired by a valid location of a quartz claim in a vein that is situate wholly on public lands, they do not attach as to any part of a vein which has already been disposed of under a valid prior grant. The distinction recognized by the authorities between a patent issued under the mining laws and one issued under an agricultural act is that under the former no part of a vein apexing on adjoining land is granted, while in the latter case any part of a vein which penetrates

and intersects the patented land passes with the patent unless questioned in a suit by the government for fraud, imposition or mistake, or by the locator of a valid claim whose location was made prior to the issuance of the patent.

From this it follows that the decree of the lower court must be affirmed, and it is so ordered.

AFFIRMED.

CoSHOW, C. J., and McBRIDE and ROSSMAN, JJ., concur.